August 22, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 99-50752
_____


SOUTHWESTERN BELL TELEPHONE COMPANY,

Plaintiff -- Appellant,

VERSUS

WALLER CREEK COMMUNICATIONS, INC.; PUBLIC UTILITY COMMISSION OF
TEXAS; PAT WOOD, III; JUDY WALSH; BRETT A. PERLMAN,

Defendants -- Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
August 21, 2000

Before REAVLEY, DAVIS, and BARKSDALE, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Southwestern Bell Telephone ("SWBT") appeals from the district court's order affirming the Texas Public Utilities Commission's ("PUC") approval of an arbitrated interconnection agreement between SWBT and Waller Creek Communications, Inc. ("Waller"). SWBT contends that the PUC erred in allowing Waller to adopt selected provisions from a prior SWBT agreement with AT&T without further negotiation, while at the same time allowing Waller to arbitrate additional provisions. We find no error in the PUC's arbitration procedures based upon its interpretation of the Telecommunications Act and the FCC's regulations. Nor do we

find any error in the substantive decisions of the PUC.  We therefore affirm.

I

The Telecommunications Act of 1996[1] was adopted to promote competition by encouraging and facilitating the entry of new telecommunications carriers into local service markets.  See AT&T Corp. v. Iowa Utilities Board ("Iowa Utilities II"), 525 U.S. 366, 371-72, 119 S.Ct. 721, 726-27 (1999); Reno v. ACLU, 521 U.S. 844, 857-58, 117 S.Ct. 2329, 2337-38 (1997).  It requires incumbent local exchange carriers ("ILECs") to interconnect with competitors (competing local exchange carriers, or "CLECs") upon request, and to negotiate interconnection agreements in good faith.  See 47 U.S.C. §§ 251(a)(1) and (c).  If the parties are unable to reach an interconnection agreement through negotiation, either party may request that a state commission (here, the Texas PUC) arbitrate the areas of dispute identified by the parties. See 47 U.S.C. § 252 (a)(2), (b).  Interconnection agreements, whether reached by negotiation or arbitration, must be presented to the PUC for approval.  See 47 U.S.C. § 252(e)(1).  When an agreement has been arbitrated, the PUC can reject it only for failure to satisfy the requirements of 47 U.S.C. §§ 251 and 252(d).  See 47 U.S.C. § 252(e)(2)(B).

Pursuant to the Telecommunications Act, Waller (a CLEC)

---

[1]Pub. L. No. 104-104, 110 Stat. 56 (1996), codified at 47 U.S.C. § 151 et seq.

2

requested negotiation of an interconnection agreement with SWBT (an ILEC). When negotiations failed to produce an agreement, Waller asked the PUC to arbitrate.

As a basis for its own agreement with SWBT, Waller sought to adopt most of the provisions of an existing interconnection agreement between SWBT and AT&T. In addition, Waller sought to arbitrate some additional provisions regarding services, uses of technology, and business plans not addressed by the AT&T/SWBT agreement. The PUC agreed with Waller that the so-called "most favored nation" ("MFN") clause of the Telecommunications Act, 47 U.S.C. § 252(i), permitted this procedure.

Section 252(i) provides that: "A local exchange carrier shall make available any interconnection, service, or network element provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier upon the same terms and conditions as those provided in the agreement."

The FCC regulation interpreting the MFN clause has been termed the "pick and choose" rule, and it provides in relevant part that:

> An incumbent LEC shall make available without unreasonable delay to any requesting telecommunications carrier any individual interconnection, service, or network element arrangement contained in any agreement to which it is a party that is approved by a state commission pursuant to section 252 of the Act, upon the same rates, terms, and conditions as those provided in the agreement....

47 C.F.R. § 51.809(a) (1998).

3

SWBT argues that the MFN clause may not be invoked to adopt certain provisions of an earlier agreement if the CLEC also seeks to create additional provisions not covered in the earlier agreement. According to SWBT, a CLEC must either adopt all of its desired terms from an existing agreement or negotiate (and, if necessary, arbitrate) every provision of its agreement from scratch.

Although the PUC allowed Waller to arbitrate issues not arbitrated between SWBT and AT&T, it did not allow re-arbitration of terms decided in the prior arbitration. The PUC-approved agreement between Waller and SWBT included some amendments and additions to the AT&T agreement, but most of the AT&T terms were adopted without change. The district court affirmed the PUC's order and dismissed SWBT's complaint with prejudice, finding no error in the PUC's interpretation of the most favored nation provision. It also found that the PUC's actions were supported by substantial evidence and were not arbitrary or capricious. SWBT now appeals.

## II

We first address Waller's contention that we lack jurisdiction over this appeal. Waller contends that the district court's order was not final because it dismissed only Counts III and IV of SWBT's five-count complaint.[2]

---

[2]The complaint alleged that: (1) the Commission erred by treating traffic destined for the Internet as local (Count I); (2) features contained in the AT&T agreement that Waller adopted and retained were unlawful (Count II); (3) the Commission had applied the MFN provision, 47 U.S.C. § 252(i), improperly (Count III); (4) the modifications Waller was allowed to make to the AT&T agreement were

4

Because the legal issues presented in Counts I, II, and V were the same as those presented by SWBT in two separate related cases pending in other courts,[3] the parties filed a joint motion to limit issues for briefing and trial to issues raised in Counts III and IV.[4] The district court granted the joint motion and ordered that no briefing or argument occur on Counts I, II, and V.[5] The agreed order further provided that the outcome of Counts I, II, and V be controlled by the other two pending appeals, and that the parties would be bound thereby. On July 2, 1999, the district court entered the order which is the subject of this appeal, affirming the decision of the PUC and dismissing SWBT's Counts III and IV with prejudice.

Waller argues that the July 2, 1999 order did not constitute a final order as to Counts I, II, and V. Thus, it contends that we lack jurisdiction over this appeal because the district court

_____

improper (Count IV); and (5) the procedures adopted by the Commission to govern arbitrations, and applied in the Waller arbitration, were erroneous and unlawful (Count V).

[3]Waller was not a party in either of those appeals. Counts II and V were raised by SWBT in its appeal to this Court in the AT&T proceeding. See Southwestern Bell v. AT&T Communications, Nos. 98-51005, 99-50060, and 99-50073. Count I raised the same issue presented to this Court in the Time Warner proceeding. See Southwestern Bell Telephone Co. v. Public Utility Comm'n of Texas, 208 F.3d 475 (5th Cir. 2000).

[4]The Agreed Joint Motion to Limit Issues for Briefing and Trial and for Continuance, filed November 13, 1998, provides, in relevant part: "[A]ll parties agree to be bound by the ultimate disposition, including disposition on appeal, of these other decisions, to the extent these other decisions adjudicate the issues raised in Counts I, II, and V of Southwestern Bell's Complaint."

[5]The Agreed Order, filed November 13, 1998, provides that, as to these counts, "all parties shall be bound by the ultimate disposition, including disposition on appeal, of the decisions in the cases listed below, to the extent these other decisions adjudicate issues raised in Counts I, II and V of Southwestern Bell's Complaint."

5

has not entered an order pursuant to Federal Rule of Civil Procedure 54(b).

We agree with SWBT that we have appellate jurisdiction in this case. Based on the parties' consent, the district court ordered that all parties would be bound by the ultimate disposition of the pending appeals in the other cases as to the issues in Counts I, II, and V.[6] The district court's July 1999 order affirmed the PUC's decision, dismissed counts III and IV with prejudice, and entered judgment. Further, it expressly stated that "[a]ll other claims have been disposed pursuant to this Court's Agreed Order, filed November 13, 1998." Nothing remains for the district court to decide in this case, because it has disposed of all counts of SWBT's complaint. If either party disputes the application to this case of any new law created in the other appeals,[7] their recourse -- under the intervening law clause of their arbitrated agreement -- is to the PUC, not to the district court. Thus, we conclude that the district court's order was final and appealable, and we therefore have jurisdiction over this appeal.

---

[6]See Agreed Order, filed November 13, 1998.

[7]The related counts in the AT&T proceeding (corresponding to Counts II and V) were dismissed by SWBT as reflected in this Court's Order of October 21, 1999. The related count in the Time Warner proceeding (corresponding to Count I) has been decided on appeal by this Court. See Southwestern Bell, 208 F.3d 475.

A.

We next turn to the merits of SWBT's appeal.  In doing so, we review the PUC's interpretation of the Telecommunications Act and the FCC's regulations de novo.  Southwestern Bell Telephone Co. v. Public Utility Comm'n of Texas, 208 F.3d 475, 482 (5th Cir. 2000); US West Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999); GTE South, Inc. v. Morrison, 199 F.3d 733, 742 (4th Cir. 1999). We review the PUC's resolution of all other issues under the "arbitrary and capricious" standard. Id.

B.

The dispute in this case centers around the scope of the "most favored nation" ("MFN") clause of the Telecommunications Act, 47 U.S.C. § 252(i), and the FCC's "pick and choose" rule interpreting that clause.[8]  The FCC's "pick and choose" rule "allow[s] requesting carriers to 'pick and choose' among individual provisions of other interconnection agreements that have previously been negotiated between an incumbent LEC and other requesting carriers without being required to accept the terms and conditions of the agreements in their entirety."  Iowa Utilities Board v. FCC ("Iowa Utilities I"), 120 F.3d 753, 800 (8th Cir. 1997) (rev'd in part by 119 S.Ct. 721 (1999)).

The question we face today is whether, under the MFN clause,

---

[8]47 C.F.R. § 51.809 (1998).

a CLEC may "pick and choose" certain provisions of an existing agreement without being required to accept the entire agreement, while at the same time seeking to negotiate and/or arbitrate new provisions not contemplated in the existing agreement.

The PUC found that, "[r]egarding new requests based upon new business ideas and arguments, ... a requesting carrier/CLEC may, consistent with [Federal Telecommunications Act] § 252(i), MFN into an existing agreement, then arbitrate new issues and incorporate the results into a new interconnection agreement."[9] If new carriers were allowed to opt into a previously-arbitrated agreement while also seeking new terms as to new business plans, technologies, or services, it would "allow[] local competition in Texas to move forward as new ideas are formulated in the competitive marketplace, thereby, building upon the groundwork laid by this Commission, SWBT, and various competitors that have arbitrated their disputes before this Commission."[10]

SWBT criticizes the PUC's interpretation of the MFN provision and the FCC's "pick and choose" rule as creating a "super-MFN" or "MFN-plus" approach, and contends that it creates a hybrid procedure not authorized or contemplated by the Telecommunications Act. SWBT argues that the Telecommunications Act creates two mutually exclusive procedures applicable to this case: (1) use of the MFN clause, § 252(i), to create an agreement

---

[9]PUC's Order Approving Interconnection Agreement ("PUC Order"), filed April 28, 1998, at 4.

[10]Id.

composed only of terms adopted unchanged from existing agreements; or (2) negotiation and, if necessary, arbitration -- under 47 U.S.C. § 252(a)-(c) -- of every term of the desired new agreement. Thus, argues SWBT, the MFN clause only allows a CLEC to opt into provisions from another existing SWBT agreement if the CLEC seeks no additions or changes to that agreement. If a CLEC wishes to include in its agreement any new term not found in a prior agreement, it may not invoke the MFN clause for any provision.

Waller contends that the MFN clause was designed to facilitate the completion of new interconnection agreements, without the need for time-consuming and costly re-litigation and re-arbitration of numerous and complex issues already decided by regulatory commissions.[11] It urges that -- contrary to Congressional intent -- SWBT's interpretation of the MFN provision would discourage innovations and new technologies by requiring CLECs with such plans to start from scratch and negotiate every minute detail of their desired agreement.

Further, Waller argues that the PUC's approach was balanced and fair to both parties. The PUC did not give Waller an unrestricted right to arbitrate new terms; rather, the PUC allowed it to arbitrate only as to new issues not contemplated by the AT&T agreement, recognizing that "not all entrants have the

_____

[11]Waller notes that the AT&T arbitration took two years to resolve all disputed issues between the parties, and that there were "thousands of discrete issues" before the PUC. Quoting PUC Order, at 3-4.

9

same business plan and may need additional terms and conditions not addressed in an existing agreement."[12] [13]  Waller was not allowed to re-litigate issues already litigated and decided in the AT&T arbitration.[14]

The Supreme Court's decision in Iowa Utilities II is instructive on this issue.  In that case, the issue was whether the MFN clause permitted a CLEC to "'pick and choose' among individual provisions of other interconnection agreements that have previously been negotiated between an incumbent LEC and other requesting carriers without being required to accept the terms and conditions of the agreements in their entirety."  Iowa Utilities I, 120 F.3d at 800; see also Iowa Utilities II, 525 U.S. at 395-96, 119 S.Ct. at 738.

The Eighth Circuit vacated the "pick and choose" rule, reasoning that it would deter voluntary negotiations favored by the Telecommunications Act by making ILECs reluctant to make

---

[12]PUC Order, at 4.

[13]For example, Waller sought "dark fiber" for the purpose of offering Ethernet service for retail customers.  Ethernet service was already provided by SWBT to its customers, but was not a service provided for in the AT&T agreement.  Thus, the AT&T agreement made dark fiber available only at a higher level of usage ("OC-12") not consistent with Ethernet service, did not include dark fiber access and information rights on a parity with SWBT, and did not include efficient use standards for the use of fiber by the ILEC and its competitors.  Thus, the PUC allowed the Waller agreement with SWBT to permit usage of dark fiber below the OC-12 level. See PUC Order at 5.  Although this amendment favored Waller, the PUC also amended the AT&T provision in favor of SWBT by shortening the length of "take-back" notice that SWBT must provide to Waller from one year to forty five days.  Id.  Also, the PUC required that access to dark fiber be reciprocal, such that Waller must make its dark fiber resources available to SWBT on similar terms.

[14]For example, the PUC refused to allow modification to the reciprocal compensation bill-and-keep period because that issue had already been addressed in the AT&T agreement and arbitration.  See PUC Order, at 5-6.

10

concessions on one term in exchange for benefits on another term, knowing that a later CLEC could receive the same concession without having to grant the same benefit.  Iowa Utilities I, 120 F.3d at 801.

The Supreme Court reversed and reinstated the "pick and choose" rule, holding that a CLEC who wants to incorporate one term from an existing agreement is not required to accept the entire agreement.  Iowa Utilities II, 525 U.S. at 395-96, 119 S.Ct. at 738.  Instead, it found that an ILEC can only require a CLEC to accept those terms in an existing agreement that it can prove are "legitimately related" to the desired term.  Id. at 396, 119 S.Ct. at 738.

In Iowa Utilities I, as in this case, the ILECs argued that the FCC's "pick and choose" rule was unduly burdensome and would "thwart negotiations" by allowing later entrants "to select the favorable terms of a prior approved agreement without being bound by the corresponding tradeoffs that were made in exchange for the favorable provisions sought by the new entrant."  120 F.3d at 800.  The Supreme Court dismissed concerns that the "pick and choose" rule would hinder the negotiation of interconnection agreements, as "a matter eminently within the expertise of the [FCC] and eminently beyond our ken."[15]  Iowa Utilities II, 525

---

[15]Similarly, the district court noted in this case, "Already, inherent in § 252(i)'s language, incumbent carriers like Southwestern Bell must certainly negotiate or arbitrate interconnection agreements with an eye towards what future carriers may do with those provisions.  In this case, the PUC specifically found that Waller Creek's unique business ventures required a modification of the AT&T terms.  It was not error to arbitrate these terms into the Waller Creek Agreement.  Does this create a 'ratcheting effect'? Perhaps so.  But, this is

11

U.S. at 395-96, 119 S.Ct. at 738.[16]

We also find nothing in the language of the MFN provision that prohibits a CLEC from accepting some provisions of an existing agreement and then negotiating and arbitrating the terms of other provisions it wishes to include in its own agreement in order to implement its own unique business plan, technologies, or services. We agree with the district court that the MFN provision is not a separate and exclusive method of creating an interconnection agreement; rather, it is a tool to facilitate the creation of negotiated or arbitrated agreements.[17]

There is nothing inherently unfair in allowing such a procedure. Under the FCC's rules, when a CLEC invokes the MFN provision, an ILEC can require it to "accept all terms that [the ILEC] can prove are 'legitimately related' to the desired term." Iowa Utilities II, 525 U.S. at 396, 119 S.Ct. at 738. Consistent with this principle, the PUC in this case refused to allow Waller to re-arbitrate issues already decided in prior arbitration; rather, it limited arbitration to new issues. On those new issues, a hearing was provided and both parties had opportunity to present evidence and arguments.

The PUC's application of the MFN provision furthers the

---

Congress's policy decision to lay the burden upon incumbent carriers. Congress turns the wheel." District Court Order, filed July 2, 1999, at 15-16.

[16]The Supreme Court also found that the FCC rule tracked the statutory language almost exactly and was therefore a reasonable and the "most readily apparent" interpretation. Id. at 396, 119 S.Ct. at 738.

[17]District Court Order, at 14.

12

purpose of the Telecommunications Act to encourage competition and "encourage the rapid deployment of new telecommunications technologies." See 110 Stat. 56 (1996). It does this by efficiently resolving disputes over interconnection agreements and permitting new competitors to enter the marketplace. The entrance of new players into the marketplace encourages new innovations and technologies to improve services for consumers. In contrast, SWBT's proposed interpretation of the MFN provision would drastically slow the resolution of new interconnection agreements by requiring potential competitors to start negotiations from scratch if they sought to provide any services not found in prior agreements. This position finds no support from Iowa Utilities II and is contrary to the purpose of the Telecommunications Act. We therefore conclude that the PUC committed no error in its application of the MFN provision and the FCC's "pick and choose" rule.

C.

Although SWBT's primary argument on appeal is that the PUC followed an improper "hybrid" procedure in arbitrating the agreement between SWBT and Waller, SWBT also challenges four specific aspects of the agreement approved by the PUC as being unfair, each of which we address below: (1) dark fiber; (2) combining elements; (3) ISDN connection; and (4) switch collocation.

We review the PUC's determinations on these issues under an

13

arbitrary and capricious standard.  See Southwestern Bell

Telephone Co., 208 F.3d at 482; US West Communications, 193 F.3d

at 1117.

### 1.  Dark Fiber

"Dark fiber" refers to fiber-optic cable that has been

installed but is not currently in use, as it has not been

equipped with electronic devices allowing it to send transmission

signals.  The AT&T agreement permitted AT&T to access SWBT's dark

fiber only for transmission of data at speeds[18] of OC-12 and

above.  The PUC's order in this case allowed Waller to gain

access to SWBT's dark fiber for transmission of data at speeds as

low as OC-3.

SWBT complains that Waller should have been required to

adopt the "dark fiber" network element upon the "same terms and

conditions" contained in the AT&T agreement.[19]  Under Iowa

Utilities II, 525 U.S. at 396, 119 S.Ct. at 738, an ILEC can

require a CLEC to accept all terms of an existing agreement that

the ILEC can prove are "legitimately related" to the terms the

CLEC wants to adopt.  SWBT contends that the dark fiber

provisions in the AT&T agreement are on their face legitimately

related to Waller obtaining dark fiber from SWBT.

Waller contends that dark fiber is not a single network

---

[18]The term "speeds" refers not to the velocity at which data travels but rather the amount of data that is packaged together to travel simultaneously on the same strand.

[19]  Although SWBT raises the dark fiber issue as an example of the unfairness resulting from the "hybrid" procedure used by the PUC, it does not ask this court to invalidate this particular aspect of the approved agreement.

element, which must be adopted on the same terms and conditions as that of the prior approved agreement, if it is provided for different functions.  According to Waller, it did not opt into the dark fiber provisions of the AT&T agreement because it wanted to offer Ethernet service to customers -- something not contemplated by the AT&T agreement.[20]  Because speeds of OC-12 are not consistent with Ethernet service, Waller sought to obtain dark fiber usage at a lower speed.  The PUC treated as separate issues dark fiber provided for use at speeds of OC-12 and dark fiber provided to allow Ethernet service.[21]

Waller argues that this "functional" approach to defining "network elements" for purposes of the MFN provision means that a CLEC need not opt into provisions of an existing agreement with no functional relevance to the services the CLEC seeks to provide.  This approach, it contends, is in accord with the holding of Iowa Utilities II because provisions with no functional relevance to the CLEC's services would not be "legitimately related to the desired term."

Waller argues further that, although the PUC allowed Waller to access SWBT dark fiber at speeds of OC-3, it modified the AT&T agreement's dark fiber terms in other ways that favored SWBT rather than Waller.  For example, while the AT&T agreement required SWBT to give twelve months notice for the return of dark

---

[20]SWBT apparently was already providing Ethernet service to its own customers.

[21]PUC Order, at 4-5.

15

fiber, the PUC reduced the required "take-back" notice to forty-five days for dark fiber used at levels below OC-12.[22]  This was done to address concerns that the fiber would be underutilized.[23]  Also, the PUC required that access to dark fiber be reciprocal, such that Waller must make its dark fiber available to SWBT on similar terms.[24]

We find nothing arbitrary and capricious in the PUC's decision to allow arbitration regarding dark fiber for Ethernet service.  Although Waller opted into many terms of the AT&T agreement, it was not required to adopt that agreement in toto.  Waller sought arbitration on dark fiber to accommodate its plan to offer Ethernet service -- a service not contemplated by the AT&T agreement.  In arbitrating the dark fiber terms, the PUC balanced the interests of both parties -- as reflected in its provisions regarding take back notice and reciprocity.

## 2.   Combining Elements

Telephone networks are composed of a large number of elements, including switches, signaling systems, wires, fiber optic cables, wiring panels, buildings, and emergency power supplies.  In its agreement with AT&T, SWBT agreed to combine elements for AT&T in order to allow AT&T to provide certain

---

[22]PUC Order, at 5.

[23]Id.

[24]Id.

services.  SWBT argues that it agreed to this term only because an FCC rule required it to do so, and that rule has now been vacated by the Eighth Circuit Court of Appeals.  <u>See</u> 47 C.F.R. § 51.315(c)-(f); <u>Iowa Utilities I</u>, 120 F.3d at 801.[25]  Thus, it contends that the Telecommunications Act does not require it to assemble combinations of elements for a CLEC.  SWBT complains that the PUC's decision to allow Waller to use the MFN clause to opt into the combining elements provisions of the AT&T agreement was in error because: (1) the provisions are now "illegal" and "unlawful;" and (2) Waller was ineligible to use the MFN clause because it chose to arbitrate other issues not contained in the AT&T agreement.  Instead, SWBT contends that the PUC should have allowed it to reopen the combining elements issue in arbitration, since Waller was allowed to arbitrate other issues.

The PUC, in response to this argument, argues that the Ninth Circuit – contrary to the Eighth Circuit – upheld 47 C.F.R. § 51.315(c)-(f), finding that a state commission can require an ILEC to combine elements for competitors even if it did not combine such elements for itself.  <u>US West Communications</u>, 193 F.3d at 1121.   The Ninth Circuit based its decision on the Supreme Court's upholding of an FCC rule requiring an ILEC to combine those network elements for a requesting CLEC that the ILEC already combined for its own use.  <u>Id</u>. (citing <u>Iowa Utilities II</u>, 525 U.S. 366, 119 S.Ct. 721).

_____

[25]This aspect of the Eighth Circuit's decision was not appealed to the Supreme Court.

17

We find nothing arbitrary and capricious about the PUC's decision to allow Waller to opt into the combining elements provision of the AT&T agreement. The MFN clause of the Telecommunications Act permits Waller to adopt any element of an existing agreement, even if it does not adopt the entire agreement. See Iowa Utilities II, 525 U.S. at 395-96, 119 S.Ct. at 738 (upholding FCC's "pick and choose" rule). The PUC therefore committed no error in refusing to allow SWBT to reopen the issue in arbitration. Waller accepted the provision without modification under the MFN clause. That clause would be stripped of any meaning if an ILEC could require a CLEC to re-litigate the provision by asserting that the ILEC erred in accepting that provision in an earlier agreement.

Further, there is nothing "illegal" about the provision requiring SWBT to combine network elements for Waller or any other CLEC. Nothing in the Telecommunications Act forbids such combinations. Even if the Eighth Circuit's decision on this issue is correct -- which we do not decide today -- it does not hold that such arrangements are prohibited; rather, it only holds that they are not required by law.

### 3. ISDN Connection

Integrated Services Digital Network ("ISDN") technology creates a new method of interconnecting to a network. According to Waller, ISDN technology makes possible new types of technical network configurations and service offerings. SWBT complains

18

that the PUC's "hybrid" procedure allowed Waller to arbitrate provisions related to ISDN, although the AT&T agreement contained no parallel provisions. However, SWBT does not specify any particular unfairness created by allowing Waller to incorporate such provisions into its agreement, nor does it point out any "legitimately related" provisions in the AT&T agreement. Thus, we find nothing arbitrary and capricious in the PUC's determinations.

### 4. Switch Collocation

At some point during negotiations, Waller requested "virtual collocation," a form of network access, for certain switches that SWBT had leased from Siemens to provide ISDN service. SWBT had decided to discontinue use of the switches and had begun "de-installing" and returning them to Siemens. Waller agreed to buy them from Siemens and requested access from SWBT, but SWBT continued to remove the switches and notified Waller that Waller would have to pay for reinstallation if it wanted access. The PUC ordered that the switches be reinstalled for collocation without imposing undue costs on Waller.

SWBT had a duty under 47 U.S.C. § 251(c)(6) to provide collocation on "just, reasonable, and nondiscriminatory" terms. The district court agreed with the PUC that SWBT's actions were anti-competitive because they would have imposed wasteful costs

19

on Waller.[26]  It noted that in a similar situation the Supreme Court upheld an FCC rule aimed at "preventing incumbent [local exchange carriers] from 'disconnect[ing] previously connected elements, over the objection of the requesting carrier, not for any productive reason, but just to impose <u>wasteful reconnection costs</u> on new entrants.'"[27]  The district court found that virtual collocation provisions allowing SWBT to impose wasteful anti-competitive costs on Waller would not be just, reasonable, and nondiscriminatory.[28]

SWBT complains that Waller was allowed to arbitrate collocation provisions, although no such provisions were contained in the AT&T agreement.  Waller contends that the switch collocation issue was never addressed in the AT&T arbitration; therefore, the PUC was consistent in only allowing arbitration of issues not already decided.

Once again, SWBT makes no attempt to explain the particular unfairness created by allowing Waller to incorporate such provisions into its agreement, nor does it point out any "legitimately related" provisions in the AT&T agreement.  For this reason, we find nothing arbitrary or capricious in the PUC's determinations, including the finding that SWBT sought to impose unnecessary costs on Waller.  Because 47 U.S.C. § 251(c)(6)

---

[26]District Court Order, filed July 2, 1999, at 18-19, 23.

[27]District Court Order, at 22 (<u>quoting</u> <u>Iowa Utilities II</u>, 119 S.Ct. at 737).

[28]District Court Order, at 22.

imposes on SWBT a duty to provide collocation on just, reasonable, and nondiscriminatory terms, the decision to order collocation without imposing unnecessary costs on Waller is in accordance with the Telecommunications Act.

IV

For the reasons stated above, we AFFIRM the judgment of the district court.