# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 05-3552 & 05-3677

MPOWER COMMUNICATIONS CORP., *et al.*,

*Plaintiffs-Appellants,*
*Cross-Appellees,*

*v.*

ILLINOIS BELL TELEPHONE COMPANY, INC.,

*Defendant-Appellee,*
*Cross-Appellant,*

and

EDWARD C. HURLEY, *et al.*, Commissioners
of the Illinois Commerce Commission,

*Defendants-Appellees.*

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 04 C 6909 & 04 C 7402—**Ruben Castillo**, *Judge.*

———————

ARGUED MAY 1, 2006—DECIDED AUGUST 4, 2006

———————

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* The Telecommunications Act of 1996 requires the local phone companies that were spun off from the old AT&T to supply services that will

enable new entrants to compete in the business. 47 U.S.C. §§ 251-54. It is conventional to call the established phone companies incumbent local exchange carriers (ILECs), their rivals competitive local exchange carriers (CLECs), and the services that the CLECs want to buy "unbundled network elements" or UNEs. The 1996 Act requires ILECs to negotiate with CLECs for contracts that specify the price that CLECs pay for UNEs. If they cannot agree (either initially or when the contracts expire), then state utilities commissions may arbitrate the dispute. This is an unusual sense of "arbitration" because it has most elements of standard ratemaking and is reviewable (in federal court, another change made by the 1996 Act), but unlike pre-1996 ratemaking this process does not occur unless private entities are unable to work out their own bargain. State commissions are required to follow directions issued by the Federal Communications Commission, which has decided that the price of UNEs should be based on the cost that an efficient ILEC would incur to provide the service using modern technology. That forward-looking standard—called the total element long-run incremental cost approach or TELRIC, see 47 C.F.R. §51.505—is still another big departure from old-style ratemaking, which was based on historical costs. The Supreme Court's lengthy opinion in *Verizon Communications Inc. v. FCC*, 535 U.S. 467 (2002), describes how the system works and holds that TELRIC is a valid way to implement the 1996 Act.

Illinois Bell had been AT&T's operating subsidiary in Illinois before Ma Bell's breakup, and it was spun off as a subsidiary of Ameritech, which comprised all local-exchange operations in the Midwest. By the time of the 1996 Act, a decade after the divestiture, the old "local" subsidiaries had joined many other firms in offering long-distance service in competition with AT&T. The 1996 Act enabled AT&T to turn the tables, and it began to offer local service, competing with its old operating companies using UNEs purchased under the new statute.

The first wave of contracts in Illinois was negotiated amicably, but when they began to expire Illinois Bell took the position that prices should be substantially increased, to which the CLECs did not agree. Instead of asking for CLEC-by-CLEC arbitration, Illinois Bell filed with the Illinois Commerce Commission (ICC, an acronym no longer ambiguous after the abolition of the Interstate Commerce Commission) a tariff stating the price at which it would make UNEs available to all CLECs. Any CLEC could take that price or negotiate for something better, with arbitration to follow if need be.

Before the ICC could act, the Illinois legislature stepped in and directed the agency to use exactly the old contract formula with two adjustments: lower "fill factors" and higher depreciation. A "fill factor" is the proportion of an efficient network that will be used at any given time. It makes no sense to build new network elements customer-by-customer; ILECs build on the assumption that demand will grow, and this enables them to choose efficiently-sized equipment and avoid disruptions such as digging up the streets every month to add new cable. If an efficient fill factor is 50%, then the capital component of the TELRIC price for a UNE is double what it would be at 100%, for each UNE effectively must compensate the ILEC for the equipment necessary to supply two circuits. Similarly, higher depreciation raises the TELRIC price because it implies that capital equipment must be replaced faster. The state legislature required the ICC to use fill factors and depreciation favorable to Illinois Bell, and to tamper with nothing else.

AT&T (in its role as a CLEC) sued its former subsidiary, and the federal district court held that this statute violated the 1996 Act because only an agency, and not a legislature, may act on behalf of a state. We disagreed with that conclusion but held that the statute is invalid nonetheless, because it had disabled the ICC from setting a proper TELRIC rate. *AT&T Communications of Illinois, Inc. v. Illinois Bell*

*Telephone Co.*, 349 F.3d 402 (7th Cir. 2003). To follow TELRIC the agency must look at the current cost of providing UNEs and cannot freeze any element of the calculation. Our opinion added that the choice of fill factor and depreciation rate are just sidelights: the agency should concentrate on the bottom line (whether the rate per UNE is a sound estimate of forward-looking costs in competition) rather than on ingredients, for in competition supply and demand, not particular items of cost, determine prices. Our opinion wrapped up by instructing the ICC to reinstate, and resolve, the tariff proceeding that Illinois Bell had initiated.

Two years later the ICC finished the job, issuing a 299-page, single-spaced opinion that raised the price per UNE by more than the CLECs wanted but not as much as Illinois Bell had proposed. A group of CLECs filed suit—but AT&T was not among them. In the interim Ameritech had merged with SBC (formerly Southwestern Bell), and SBC in turn had acquired what was left of AT&T—and SBC then changed its own name to AT&T. So AT&T once again is in the business of both long distance and local telephone service, but there is much more competition in both segments of the market than 20 years ago (with cell phone providers, cable TV proprietors, and voice-over-internet companies offering both local and long distance service in competition with landline carriers). The 1996 Act is itself technologically creaky: the assumptions of a decade ago no longer describe the state of competition in this business, and with the advent of competition from so many new sources the whole regulatory model—which assumes that each ILEC retains a natural monopoly on local cabling and switches—is open to question. The FCC has moved away from the 1996 Act's model to the extent the law allows and has permitted proprietors of new technologies to act as pure competitors, without an obligation to share their facilities with business rivals. See, e.g., *National Cable & Telecommunications Association v. Brand X Internet Services*, 125 S. Ct. 2688 (2005). Cf.

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) (antitrust laws do not require ILECs to cooperate with CLECs in sharing or selling facilities). A mandatory-sharing requirement may delay innovation. See Marc Bourreau & Pinar Do–an, *"Build-or-Buy" Strategies in the Local Loop*, 96 Am. Econ. Rev. (Papers & Proceedings) 72 (2006). But open competition is not an option for landline services offered by ILECs, to which the 1996 Act squarely applies. Thus we, like the ICC, must apply TELRIC to Illinois Bell's tariff.

The CLECs contend that the ICC made three errors, each of which increased the price per UNE: it set the fill factor too low, it set depreciation too high, and it assumed an inefficient mix of equipment. Illinois Bell filed its own suit, contending that the price per UNE had been set too low because the ICC had not allowed it to earn a fully competitive rate of return on investment. (Other arguments were made in the district court but have not been renewed on appeal, so we disregard them.) The district court concluded that the ICC acted properly with respect to fill factors and depreciation but had erred with respect to the equipment mix and the rate of return on investment, and it ordered the Commission to revise the tariff accordingly. 381 F. Supp. 2d 738 (N.D. Ill. 2005). The district judge also considered a further issue: whether the 1996 Act preempts all tariff proceedings, as the CLECs maintain. The judge gave a negative answer, and we start with that subject because it has the potential to make everything else irrelevant.

*Wisconsin Bell, Inc. v. Bie*, 340 F.3d 441 (7th Cir. 2003), on which the CLECs rely, holds that states may not insist that ILECs file tariffs for UNEs. The 1996 Act starts with contracts rather than tariffs, see 47 U.S.C. §252(a), and state regulators serve as arbitrators rather than rate-setters, §252(b)(1). Forcing ILECs to file tariffs is equivalent

to compelling them to make public their reservation price (that is, the lowest price they will accept in bargaining). That would unhinge the 1996 Act's system, we concluded, for it would give the CLECs an extra opportunity: they could take the offer if it turned out to be attractive, or bargain for still lower prices in the knowledge that the price never could exceed the tariff. In ordinary contracting, by contrast, someone who rejects an initial offer takes the chance that the final deal will be at a higher price. We held that states must respect the statute's framework: bargaining precedes the involvement of regulatory officials, and in bargaining the parties may keep their reservation prices to themselves and may raise their demands as part of the bargaining process. See also *Indiana Bell Telephone Co. v. Indiana Utility Regulatory Commission*, 359 F.3d 493 (7th Cir. 2004) (holding that another state's system compelling ILECs to offer prices or services in ways other than the 1996 Act provides is preempted by federal law).

Illinois has not required any ILEC to file a tariff. Our holding in *Wisconsin Bell* that states cannot *compel* ILECs to use tariffs does not imply that states must *forbid* ILECs to employ that device. The problems with a mandatory-tariffing approach are that it compels ILECs to tip their hands when they may prefer confidentiality, deprives them of a bargaining strategy, and it moves regulatory price-setting ahead of negotiation. None of these has occurred in Illinois. Indeed, Illinois Bell and the CLECs *did* negotiate contracts before any tariff was filed. Illinois Bell turned to the ICC only after the contracts had expired and a dispute had erupted about the price for renewal. The 1996 Act empowers state utilities commissions to resolve such disputes, §252(b)(1), and the contracts themselves provide that the parties may repair to the ICC if negotiations at renewal time fail. Although the statute calls the state agency's role "arbitration," we remarked three years ago that as a functional matter this tariff proceeding is the

arbitration of which the federal law speaks. 349 F.3d at 405. The FCC agrees, stating that, when common questions affect multiple contracts, state regulators may address these questions in a consolidated proceeding while reserving other subjects for arbitration. See *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499 at ¶693 (Aug. 8, 1996). As it happens, Illinois Bell initiated a consolidated proceeding so comprehensive that nothing will be left for individual arbitrations, but that can't diminish the state agency's power to resolve at one go all of the questions that the parties voluntarily submit for decision.

When we turn to the merits, one fact eclipses everything else: neither Illinois Bell nor the CLECs contends that the ICC's estimate of TELRIC is unreasonable or unsupported by substantial evidence. Instead the parties cherry-pick issues: Illinois Bell disagrees with the ICC about the competitive rate of return, and the CLECs with the Commission's handling of fill rates, depreciation, and equipment mix. Yet such an issue-by-issue approach is a characteristic of old-style rate regulation, where a state commission determines how much capital a utility has reasonably invested in its plant and then sets the reasonable rate of return on that investment. TELRIC is supposed to be different. The parties (when they negotiate) and the regulators (when they arbitrate) are supposed to approximate how much it would cost to supply a given service with new equipment in a competitive market.

Because the endeavor is hypothetical and prospective, it is impossible to find "right" answers; there are only better and worse estimates. And because, in competition, firms can't "recover costs"—that's the natural-monopoly ratemaking approach, while competition sets price where supply and demand schedules meet—detailed estimates of these costs are not controlling. That's why our initial

opinion observed that the Illinois legislature made a substantive error in directing the ICC to adjust only the fill rates and depreciation factors. Fill rates and other items are not right or wrong in the abstract, but only useful (or not) as reality checks when trying to estimate the price that would prevail under competition with efficient production. *That* is the objective of the exercise, and an unduly high fill rate may balance unduly low depreciation—or both could be beside the point if there is some other way (such as looking at the behavior of new entrants, or ILECs building new networks) to get at the subject directly. It is also why, as we stressed in 2003, the FCC has allowed parties and state agencies to use many different approaches, for they are just mileposts rather than free-standing ingredients of some formula. See 349 F.3d at 405.

So we are not at all inclined to pore over the ICC's decision one issue at a time. All a court need do is determine whether the ICC's bottom line is supported by the record. That is what the Supreme Court in *Verizon* assumed would happen. See 535 U.S. at 522-28. It is what we said three years ago should happen, 349 F.3d at 409, and the parties have not supplied any reason to depart from that understanding. Yet neither have the parties addressed the subject. None of the litigants has given us any reason to doubt that the agency's bottom line is supported by substantial evidence.

To see why it would be foolish to take issues out of the context of the whole calculation, one has only to consider the parties' dispute about what return a competitive market would allow to an ILEC on capital investments. Instead of asking that in a straightforward way, the ICC (apparently at the parties' urging) first decided how much capital an ILEC would raise from stock and how much from debt, and then it set a rate of return on each. Debt investments are safer, because in bankruptcy debt investors recover in full before equity investors are entitled to anything, so the stated rate

of return on debt is lower than the (implicit) return on equity, which represents the residual claim after all other participants (debt investors, workers, vendors, and so on) have been paid off. In the district court the parties accepted the ICC's assumption about the overall rate of return on debt plus equity, but Illinois Bell argued that the ICC had prescribed the wrong capital structure for a competitive firm. That, however, attempts to disentangle matters that are inseparable: one can't *assume* a rate of return on debt (or equity) and then play with the ratio between them, or the reverse. Instead the ratio determines the risk, and this the rate of return, for each component.

The parties' submissions imply that they (and perhaps the ICC) have overlooked the point—fundamental to corporate finance—that the debt/equity ratio does not affect aggregate returns but just apportions returns according to the risk each set of investors has assumed. See Stewart C. Myers, *Capital Structure*, 15 J. Econ. Perspectives 81 (Spring 2001) (surveying the state of the field, and in particular the foundational work of Franco Modigliani and Merton H. Miller, starting with *The Cost of Capital, Corporate Finance, and the Theory of Investment*, 48 Am. Econ. Rev. 261 (1958)). See also, e.g., Michael J. Barclay & Clifford W. Smith, Jr., *The Capital Structure Puzzle: The Evidence Revisited*, 17 J. Applied Corporate Finance 8 (Winter 2005); Merton H. Miller, *Leverage*, 46 J. Finance 479 (1991). One wonders why, so long after Modigliani and Miller won Nobel Prizes, the ICC bothers to think about capital structure, as opposed to an overall risk-adjusted rate of return, but none of the litigants has raised that issue. Instead they want us to concentrate on just one aspect of an indivisible whole, which would make no sense.

Now we do have to grapple with one issue as a stand-alone matter. The district judge concluded that the ICC made a legal error that is independent of any practical effort to estimate the cost of furnishing efficient service.

One piece of equipment required for modern phone service is a digital loop carrier. The ICC concluded that an efficient provider would use about 88% universal digital loop carriers (UDLCs) and 12% integrated digital loop carriers (IDLCs). Although IDLCs are less expensive per customer, they are also more difficult to use in providing UNEs to CLECs. The ICC concluded that IDLCs "cannot be effectively unbundled" and thus are less flexible. Without taking issue with the ICC's finding either about limits on the ways IDLCs can be used or the mix that a fully competitive phone provider would select, the district court held that the agency must base its decision on an assumption that TELRIC requires 100% IDLC equipment. 381 F. Supp. 2d at 756-57. That's so, the court stated, because, when calculating TELRIC in a proceeding arising from Virginia, the FCC used 100% IDLC as the basis of its rate. See *In re WorldCom, Inc.*, 18 F.C.C.R. 17722 at ¶312 (Aug. 29, 2003). Once the FCC takes a stand on any issue, the district court concluded, all state agencies must fall into line.

One problem with this conclusion is that "the FCC" has not taken a stand. The Virginia dispute was arbitrated by the FCC's Wireline Competition Bureau; that Bureau's decision was not appealed to, or passed on, by the Commission. No one appointed by the President took any part in the proceedings. Under the Administrative Procedures Act, federal agencies make binding decisions through rulemaking or adjudication; the Virginia arbitration was neither. Statements by agencies' bureaucracies (or their lawyers) may offer illumination helpful in understanding published rules or decisions. See *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 233, 241 (1986); *Indiana Bell Telephone Co. v. McCarthy*, 362 F.3d 378, 386 (7th Cir. 2004). Here, however, there is no decision by the Commission in need of explication. All we have is action by subordinate employees. See also *Chicago Board of Trade v. SEC*, 883 F.2d 525, 529-30 (7th Cir. 1989) (ruling by SEC's

Division of Market Regulation has no legal consequence unless reviewed and approved by the Commissioners).

A second problem is that, even if the Wireline Competition Bureau were speaking for the Commission, it did not establish a legal rule that 100% IDLC is the only setup that satisfies TELRIC. Both the Commission and the D.C. Circuit have stressed that there can be multiple ways to approximate that benchmark—which, since it is hypothetical and prospective, has no tried-and-true or mandatory elements. See *AT&T Corp. v. FCC*, 220 F.3d 607, 615-16 (D.C. Cir. 2000); *Sprint Communications Co. v. FCC*, 274 F.3d 549, 556 (D.C. Cir. 2001); Report and Order, FCC 03-36, 68 Fed. Reg. 52,276, 52,284 (Aug. 21, 2003) (*Triennial Review*). That's what we said three years ago. 349 F.3d at 405. The Bureau used 100% IDLC in the Virginia proceeding, but to say (or demonstrate) that "X is a lawful way to proceed" is not to establish that "X is the *only* way to proceed." Confusing sufficient with necessary conditions is a logical blunder. See *United States v. Knights*, 534 U.S. 112, 117-18 (2001). Nothing in the Virginia Arbitration Order implies that 100% IDLC is indispensable in all efforts to approximate a TELRIC price.

It remains only to say that we have considered the parties' arguments about fill factors, depreciation, and rate of return, and concluded that these contentions do not show that the ICC made any error so large that it threw the bottom line out of whack. Attempts to estimate a hypothetical rate are bound to be contentious, and it will always be possible to say that the agency should have used a little more of one thing or less of another. Unless these arguments show that the bottom line is an arbitrary or capricious estimate of TELRIC, however, they do not supply a good reason to upset the agency's decision.

The judgment of the district court is vacated, and the case is remanded with instructions to enter a new judgment sustaining the ICC's decision in full.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*